Abraham N. Geller, J.
This action was brought by the plaintiff insurance company to rescind and uppn the ground of misrepresentations and concealment of material facts in the insured’s applications for said policies. The defendants are the insured and his wife, who is the irrevocable beneficiary of the life policy here involved. The three policies *880 in suit are a life insurance policy for $10,000 issued May 4, 1953; a personal accident and health policy issued November 24, 1953, and a family hospital and surgical expense policy issued November 24,1953. The action was instituted within the periods of incontestability provided for in the policies.
The controlling law, as delineated in the applicable statute and as applied by the cases, briefly stated, is that no misrepresentation shall avoid an insurance policy unless such misrepresentation was material, and that no misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to its refusal to issue the policy (Insurance Law, § 149; Misrepresentation by Insured Under New York Insurance Law, 1944, 44 Col. L. Rev. 241).
The tests to be applied in this kind of case were stated by Mr. (now Presiding) Justice Peck, at Special Term, in New York Life Ins. Co. v. Miller (47 N. Y. S. 2d 654, 655), as follows: “ The questionnaire in the application is for the purpose of informing the insurance company on matters which it regards as material in passing upon the risk. The insurance company is entitled to form and follow its own judgment as to risks and to know all the facts which may reasonably affect its judgment. Where, therefore, the applicant fails to give truthful answers to the questionnaire, the court may not, upon a subsequent disclosure, substitute its judgment of the risk for the judgment of the insurance company, or indulge its opinion of what the insurance company would have done had the disclosure been complete in the first place. The court should protect the insured against an arbitrary cancellation of the policy, but it must also protect the insurance company against a deprivation of the right to exercise its own judgment. The rights of the parties are reconciled by the court considering and determining whether the facts not disclosed might reasonably affect the insurance company’s judgment. If not, the nondisclosure is not a false representation and the insurance company will not be permitted to take what would be an unconscionable advantage of an innocuous misstatement. If the facts not disclosed are such as might reasonably affect the insurance company’s judgment, it is again entitled to a free choice as to whether to accept or reject the risk.”
The statute (Insurance Law, § 149, subd. 3) provides expressly that in determining the question of materiality of the alleged misrepresentations, evidence of the insurer’s practice with respect to the acceptance or rejection of similar risks shall be admissible, and evidence of this character has been offered by the insurer in this case.
*881 In 1953, when the policies in suit were applied for and issued, the insured was about 50 years of age and was employed as a salesman.
In part B of the application signed by the insured on April 21, 1953, for the life policy, the insured answered questions addressed to his health and medical history as follows: “ 1. Are you now in good health and able to carry out your full duties? (If not, give full particulars.) Yes. 2. (a) When were you last sick? Month. Nov. Year. 1952. Name of doctor. A. Goldberg. Nature of sickness (doctor’s diagnosis if you had a doctor), grippe, (b) How much time have you lost from school or work in the past five years on account of poor health? None. 3. Have you ever had or been treated for or sought advice concerning any ailment or disease of: Yes or No (a) The heart or lungs? No. (e) The bones, glands, eyes or ears? No. 4. Have you ever had or been treated for or sought advice concerning: (a) Tuberculosis, pleurisy, asthma, anemia, or any disease of the blood or blood vessels? No. (e) High blood pressure? (If yes, how high was the blood pressure?) No. 5. (d) Do you have a periodic physical examinations or check-ups? Yes about once a year — Dr. Irv. Tenzer. (e) Have you ever had an electrocardiogram or X-ray examination or any laboratory examinations or tests ? Yes. Chest x-ray & EKG 4 yrs ago — Dr. Tenzer, Grand Concourse, both negative, (f) Have you consulted any physician, healer or other practitioner within the past 5 years for any reason not mentioned above? No.”
Before the life policy was issued the insured was examined by the company’s physician, who, among other things, checked the insured’s heart and blood pressure, and reported nothing-unfavorable or adverse so far as the insured’s health was concerned. An investigation made by the Hooper-Holmes Bureau, Inc., for the company reported, among other things, that ‘' informants * * * state the applicant is active daily and in apparent good health.”
The first annual premium on the life policy was paid on or about May 4, 1953, the issue date of such policy.
The applications for the accident and health policy and for the hospital and surgical expense policy were signed by the insured on November 5, 1953. In his application for the accident and health policy the insured answered questions addressed to his health as follows: “ 18. Have you ever been treated for, or been told that you had, any of the following: (Answer each, if any answer is ‘ yes,’ give particulars) * * * High blood pressure? No. Disease of the heart or lungs? No. Brain or nervous system? No. Bones? No. * * * 19. Have you, *882 within the last five years, had medical or surgical advice or treatment or any injury? (Answer yes or no). No.”
In his application for the hospital and surgical expense policy the insured answered the questions as to his health as follows: * * * 11. Have you or any of the family members named in statement 8 any deformity, or any loss of limbs, or impairment of sight or hearing? No. Have you or any of the said family members ever been treated for or told that they had any other bodily or mental disease or disorder? (If either answer is yes, give the particulars). No. * * * 13. Have you or any of the family members named in statement 8, within the last five years, had any diseases, ailments, or injuries, which required treatment, examination, or advice by a doctor or at a clinic, hospital, dispensary, or sanatorium? No.”
The first annual premiums on the latter two policies were paid on or about November 24, 1953, the issue date of such policies.
On or about March 4, 1954, the company paid the insured benefits of $121.43 under the accident and health policy, and on or about February 23, 1954, the company paid benefits of $123.39 under the hospital and surgical expense policy.
Subsequently, the insured suffered a coronary thrombosis, and by reason thereof made claim on the company in April, 1954 for sickness benefits under the accident and health policy. This action to rescind and cancel all three policies was then instituted by the company.
The company contends in its amended complaint that the policies were obtained by misrepresentations and concealment of material facts in that the insured was not in good health; that in 1950 he had consulted Dr. Tenzer and received medical treatment, X rays and electro-cardiograms disclosing some osteoarthritic changes; that in 1952 he had received treatment or attention from a Dr. Goldberg for other than grippe, and had electro-cardiograms and tests for intermittent palpitation, tachycardia and thyroid fullness, and was found to have blood pressure of about 190/80 and a psychoneurosis with neurocirculatory asthenia, and had consulted a doctor or doctors and received treatment for lower back strain. Additionally, and with respect to the accident and health policy and the hospital and surgical expense policy, the company contends in its complaint that after the applications therefor were signed and before delivery of the policies the insured had palpitation and blood pressure of 180/90 and a sinus tachycardia, and had a psychoneurosis with neuroeireulatory asthenia, and had treatment for low back strain..
*883 The material and credible evidence with respect to the company’s contentions is set forth below.
Doctors Tenzer and Goldberg, whose names were disclosed by the insured on the application for the life policy, were called as witnesses by the company. Dr. Tenzer testified that he examined the insured in November, 1950, in connection with the insured’s complaint of a low back ache. The X rays taken showed “minimal osteo-arthritic changes” of the spine, and the diagnosis was also that of a low back strain. Dr. Tenzer believes that he told the insured that the insured had ‘ ‘ minor arthritis of the spine, ’ ’ a condition involving proliferation of calcium around the joint. He prescribed a drug to reduce inflammation of the joints, and never saw or examined the insured again.
Dr. Tenzer testified that the low back strain was a temporary affair. He further testified that the osteo-arthritic condition was part of the normal aging process and was common to a man of the insured’s age. This was not rebutted, and, indeed, was confirmed by the medical testimony offered on behalf of the company.
It seems perfectly obvious, and the court finds, that in 1950 the defendant had a temporary and nondisabling low back ache for which he sought medical advice, and that the X rays taken to determine the cause of the complaint were negative, except that they showed a spine condition common and normal for a man of the insured’s age.
Dr. Goldberg testified that he first saw and examined the insured on October 27, 1952, when the insured complained of chest palpitations. On that occasion he found the insured’s blood pressure to be 190/80, which was above normal, and that the insured had a rapid heart rate (sinus tachycardia). By way of impression, Dr. Goldberg ‘ ‘ thought that I felt some fullness in the thyroid area. ’ ’ A basal metabolism was taken, which was normal and disproved the doctor’s preliminary impression of hyperthyroidism. Dr. Goldberg also stated an impression of psychoneurosis, with neurocirculatory asthenia. The electrocardiogram was normal. Dr. Goldberg found the insured apprehensive and nervous, because the chest palpitations of which the insured complained had evidently frightened him into thinking that he might have heart disease. Dr. Goldberg found that the insured “was in excellent physical health,” and he told him so. Dr. Goldberg also reassured the insured that he had no organic heart disease. A sedative was prescribed for the insured’s nervousness. Dr. Goldberg further testified that the insured was not suffering from, and was never treated for, hypertension. There is no evidence that the insured’s blood *884 pressure was above normal on any occasion prior to issuance of the life policy, other than on the isolated occasion of his examination by Dr. Goldberg in October, 1952. At the time of his examination by the company’s physician in connection with the application for the life policy the insured’s blood pressure was normal.
Dr. Goldberg further testified without contradiction, that blood pressures vary with emotional upsets, and that a person who is nervous and under emotional strain frequently has a higher blood pressure when he comes to a doctor for examination. When Dr. Goldberg was asked whether he had given the insured any advice concerning high blood pressure he replied: “ Not that I recall, because in my opinion he did not have true hypertension, and I did not want to complicate these matters. With these patients who are tense, the less said of those things are the better.”
The medical testimony in this case concerning Dr. Goldberg’s impression of psychoneurosis with neurocirculatory asthenia establishes to my satisfaction that this rather impressive medical phrase, so far as the insured here is concerned, indicates nothing more than a somewhat nervous person; it is another way of saying that the insured was tense and under strain, a condition which is hardly unusual or serious.
The testimony of the company’s physician confirms that psychoneurosis with neurocirculatory asthenia is not an organic disease and that it is fairly common. He further testified that neurocirculatory asthenia is characterized by nervousness, a rapid pulse and easy tiring and low blood pressure, and that high blood pressure and neurocirculatory asthenia are “ opposite and mutually exclusive.”
There is no evidence that the insured at any time sought or obtained psychological or psychiatric help. Indeed, referring to the alleged psychoneurosis, the company’s physician testified that psychologists usually handle it best, “ but not necessarily; if they (the patients) will sit down with their family physician frequently it can be cleared up.” So far as Dr. Goldberg’s impression of psychoneurosis with neurocirculatory asthenia is concerned, it may be pointed out, without any reflection on Dr. Goldberg, of course, that he had been practicing medicine for only six years at the time that he examined the applicant in October, 1952, that he does not specialize in neurology, psychiatry or psychology, and that he is a general practitioner, with special training in cardiology.
It seems to me clear from the record that as a result of the insured’s examination by Dr. Goldberg in October, 1952, he was *885 reassured and advised by the doctor that he was in excellent physical health. There is no evidence that Dr. Goldberg told the insured anything which would give him the slightest reason for thinking that he was a sick man or that he had a serious ailment.
I cannot find from the evidence that Dr. Goldberg informed the insured of the single blood pressure reading of 190/80, or that he informed the insured of his impression of thyroid fullness (an impression which was later disproved), or that he informed the insured of his impression of psychoneurosis with neurocirculatory asthenia.
In applying the pertinent law to the facts of this case I have,, of course, borne in mind the authoritative interpretation of section 149 of the Insurance Law, as set forth in Tolar v. Metropolitan Life Ins. Co. (297 N. Y. 441, 447), as follows: “ If an applicant misrepresents that he has not had ‘ previous medical treatment, consultation or observation ’, he is then deemed to have represented that he has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed practitioner as a result of such consultation or observation.”
There are, of course, cases, some of them cited by the company, in which issues of the character here presented are to be determined as questions of law, i.e., cases, for example, where the insured has concealed from the insurer a serious disease,, condition or ailment, disclosure of which would have led the insurer to have refused to issue the policy, or cases where the insured, or those standing in his shoes, prevent the insurer from inquiring into ailments or diseases or hospital treatments which should have been, but were not, disclosed to the insurer. Cases falling within these areas, such as Cherkes v. Postal Life Ins. Co. (285 App. Div. 514), Reznikoff v. Equitable Life Assur. Soc. (267 App. Div. 785, affd. 294 N. Y. 935) and New York Life Ins. Co. v. Miller (supra) are, in my opinion, readily distinguishable from the one at bar. Under the circumstances of this case the issues here presented are issues of fact (Langer v. Metropolitan Life Ins. Co., 290 N. Y. 601; Guiliani v. Metropolitan Life Ins. Co., 269 App. Div. 376; Birnbaum v. Equitable Life Assur. Soc., 257 App. Div. 836).
In my opinion, this case falls within the doctrine that the misrepresentation is not material where the ailment or illness is trivial or may be so considered, and where impairment of general health is not involved (Jenkins v. John Hancock Mut. Life Ins. Co., 257 N. Y. 289, 293; Geer v. Union Mut. Life Ins. Co., 273 N. Y. 261, 267; Glickman v. New York Life Ins. Co., *886 291 N. Y. 45; Metropolitan Life Ins. Co. v. Goldsmith, 201 Misc. 569; Metropolitan Life Ins. Co. v. Begelman, 99 N. Y. S. 2d 781; Birnbaum v. Equitable Life Assur. Soc., supra; cf. Lampke v. Metropolitan Life Ins. Co., 279 N. Y. 157).
I do not think, and I can find no case which would warrant me in holding, that failure on the part of an applicant for an insurance policy to disclose to the insurance company impressions, of which the applicant was unaware, recorded by his physician, are enough to vitiate the policy, notwithstanding that the applicant is in apparent good health and has been advised by his physician that his health is excellent. An applicant for an insurance policy who is in apparent good health, who is functioning actively in his employment or business, and is assured by his doctor that he is well, and whose examination by the insurance company’s physician discloses nothing unfavorable to his health, should not stand to lose his policy because his doctor has recorded some impressions, however mistaken they may be, which were not conveyed to the patient (see Bronx Sav. Bank v. Weigandt, 1 N Y 2d 545, affg. 286 App. Div. 748, which affd. 207 Misc. 820; Sommer v. Guardian Life Ins. Co., 281 N. Y. 508; Birnbaum v. Equitable Life Assur. Soc., supra).
The company makes the further contention with respect to the accident and health policy, and the hospital and surgical expense policy, that the insured was under an obligation to disclose to the company his visit to a physician after the application for these policies on November 5, 1953, and before the issuance thereof on November 24, 1953. Concededly, the insured was examined by Dr. Goldberg on November 16, 1953, and did not report this visit to the company. The undisputed facts concerning this visit are that the insured’s brother had died on the previous day, that the insured was emotionally upset and that Dr. Goldberg prescribed a sedative for him to quiet his nerves. In my opinion, the insured’s condition on this occasion was not of a serious nature, and hence his failure to report the visit to the company cannot justify the cancellation of the two policies just mentioned.
So far as the accident and health policy and hospital and surgical expense policy here involved are concerned, plaintiff’s counsel conceded on the trial that the insurer is chargeable with knowledge of its records concerning the prior life policy here in suit, and I believe that concession is a correct statement of the law (Lanigan v. Prudential Life Ins. Co., 63 Hun 408).
I am, of course, not bound to accept the evidence offered by the insurer that it would not have issued the policies if it had known of the alleged misrepresentations.
*887 In light of all the facts and circumstances, and bearing in mind the applicable tests and rules of law mentioned above, I find and decide that the plaintiff insurance company has failed by a fair preponderance of the credible evidence to sustain its burden of proving (1) that the misrepresentations asserted and relied upon by it were material, and (2) that knowledge by it of the facts claimed to have been misrepresented and concealed would have led to its refusal to issue the policies. Accordingly, the amended complaint should be, and is, dismissed on the merits, without costs.
This constitutes the decision of the court in accordance with section 440 of the Civil Practice Act.
Settle judgment.